1

2

3

4

5

6

7

8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| JASON DEWAYNE ENNIS, | ) | Case No. 1:07-cv-01792-AWI-BAK (DLB) |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER ON PLAINTIFF'S |
| | ) | APPEAL FROM ADMINISTRATIVE DECISION |
| | ) | |
| v. | ) | ORDER DIRECTING REMAND PURSUANT TO |
| | ) | 42 U.S.C. § 405(g) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | ORDER DIRECTING THE CLERK TO ENTER |
| Commissioner of Social Security, | ) | JUDGMENT FOR PLAINTIFF JASON DEWAYNE |
| | ) | ENNIS AND AGAINST MICHAEL J. ASTRUE, |
| Defendant. | ) | COMMISSIONER OF SOCIAL SECURITY |
| | ) | |

**BACKGROUND**

Plaintiff Jason D. Ennis ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance

Benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the

Social Security Act ("the Act"). The matter is currently before the Court on the parties' briefs,

which have been submitted, without oral argument, to the Honorable Dennis L. Beck, United States

Magistrate Judge.[1]

**PROCEDURAL HISTORY**

On March 15, 2005, 2005, Plaintiff, born on June 8, 1975, applied for a period of disability

and disability insurance benefits and for SSI. (Administrative Record ("A.R.") 29, 352, 353.)

_____

[1]  The parties consented to the jurisdiction of the United States Magistrate Judge. On April 6, 2009, the actions was temporarily assigned to the Honorable Dennis L. Beck for all purposes.

Plaintiff alleged disability beginning March 1, 2004 due to major motor seizures, learning disability, severe anxiety, depression, and problems with management of explosive anger.  (A.R. 115, 41.)  The protective filing date of those applications was February 28, 2005.  (A.R. 4.)  After Plaintiff's claim was denied initially and on reconsideration, Plaintiff requested a hearing before and administrative law judge ("ALJ").  (A.R. 41, 48, 54.)  On October 25, 2006, that hearing was conducted by the Honorable Christopher Larsen, Administrative Law Judge.  (A.R. 361.)  Plaintiff appeared telephonically and testified, as did Cheryl Chandler, vocational expert ("VE").  (A.R. 361, 362.)  Plaintiff had the assistance of counsel at that hearing.  (A.R. 361, 363.)  On November 22, 2006, the ALJ denied Plaintiff's applications for benefits.  (A.R. 16-22.)  On October 13, 2007, the Appeals Council denied review.  (A.R. 6-9.)  Plaintiff filed his complaint  seeking review of the Commissioner's final decision on December 10, 2007.

## STATEMENT OF FACTS

For some time before the filing of his application for disability benefits, Plaintiff claimed to have struggled with learning disabilities, episodic rage, depression, and severe anxiety.  Sometime during the first two weeks in March, 2005, Plaintiff experienced the first of several major motor seizures.  (A.R. 142, 233, 297.)  This combination of conditions led Plaintiff to file his application for benefits on March 15, 2005.  (A.R. 41-45, 79-83, 115.)  Less than twenty-four hours after filing the paperwork for disability benefits under the Act, Plaintiff suffered a second major seizure in the early morning hours of March 16, 2005 while at home.  (A.R. 297-302.)  That seizure – described by the neurologist who was to become one of Plaintiff's treatment providers as a grand mal seizure (A.R. 282) – led to Plaintiff's hospitalization at San Joaquin Community Hospital.  (A.R. 305.)  There, he was assessed and treated, initially in the emergency room, and later on the hospital's medical unit, for further management and care of both the seizure disorder and a fractured left shoulder injured during the course of the early morning seizure.  (A.R. 305-306.)  Plaintiff was discharged from the hospital two days later.  (A.R. 297.)  Surgery to repair the fracture in his left shoulder was done later and physical rehabilitation therapy provided.  (A.R. 372.) Plaintiff is right-handed.  (A.R. 150.)

Over the course of the next eighteen months, Plaintiff's seizure disorder was treated with

medication targeting both the seizure activity and the anxiety, periodic blood testing to measure therapeutic levels of the medication in Plaintiff's body, and physical examinations by Plaintiff's primary care physician and his neurologist.  (A.R. 133, 143, 171, 277, 278, 297-298, 349, 351.)  Two EEGs were done during the period in question to assess and monitor the condition of Plaintiff's seizure disorder, one in March of 2005 and the other in August of 2006; results from both studies were normal.  (A.R. 336, 350.)  Plaintiff claimed to have taken the various medication as prescribed (A.R. 370-371, 344) but experienced several further seizures, apparently while awake.  (A.R. 341, 344.)  Plaintiff also believed that he had experienced other seizures while sleeping, of which he was not aware, based on his physical condition when he awoke the following morning.  (A.R. 277, 278.)  Plaintiff apparently experienced increased levels of stress and anxiety as a result of both having this seizure disorder and the functional limitations imposed by his allegedly disabling conditions.  (A.R. 369-370, 374, 375-376, 377, 379.)

At the October 25, 2006 administrative hearing, in response to questions posed by his attorney, Plaintiff  testified that he had been out of work for a little over two years due to mental health problems (A.R. 367) and, later, his seizure disorder and  shoulder fracture.[2]  (A.R. 369.)  At the time of the hearing, Plaintiff had not attempted to return to work.  (Id.)  Plaintiff no longer had a driver's license because of his epilepsy.  (A.R. 377.)  He testified that his doctor instructed him not to use the public bus system on his own.  (A.R. 374.) Plaintiff testified that he spends his time maintaining his family, trying to keep up the yard and the house as best he can.  (A.R. 369.)  But his medications and stress levels restrict him in what he can do for the family.  (Id.)  He is married, with an older child and a new baby.  (Id., A.R. 374.)  His ability to participate in some parenting activities, i.e., those occurring outdoors and in warm weather, is limited and can result in a seizure.  He avoids those activities as a result because he does not want his daughter to see him experiencing a seizure.  (A.R. 369, 370.)  Plaintiff's ability to do some household maintenance is also limited.  (A.R. 374.)

---

[2]  Plaintiff's abilities to understand what the questions are asking, and to communicate clearly in response to the questions posed at this hearing, seem limited.  Additionally, Plaintiff appears to be a rather poor historian, at least when it comes to remembering dates.  These deficits seem to be related to a cognitive disorder and not an effort to obfuscate or to manipulate information to his advantage.  (A.R. 242-245.)  In summarizing Plaintiff's testimony, the Court makes every effort to be both reasonable and objective in those instances where Plaintiff's answers appear confused and/or "non-responsive."

1  Certain medications he takes to manage his condition cause skin rashes if he is out in the sun, and his

2  doctor has instructed him to avoid that exposure.  (A.R. 370.)  Plaintiff testified that being out in the

3  sun for thirty to sixty minutes mowing his "not very big front yard" completely exhausts him.  (A.R.

4  375.)  He attempts to help his wife clean the house and take care of the baby but the seizures

5  medications seriously disrupt his nighttime sleep (four to five hours) and results in the need to sleep

6  in the afternoon.  (A.R. 374.)

7         Plaintiff testified that his medications have helped to reduce the frequency of his seizures.

8  He said he was then taking Depakote, "500 milligrams, five times a day"; Dilantin, "300 milligrams

9  little capsules a day"; 50 milligrams of BuSpar[3] a day; and Elavil, 800 milligrams a day.[4]  (A.R.

10  370.)  Plaintiff takes the Elavil to help him sleep and other medication for stress (apparently,

11  BuSpar).  (Id.)  He uses Albuterol as well and testified that he took that medication for seizure.

12  (A.R. 370-371.) [Dr. Entabi, Plaintiff's most recent primary care physician, prescribed an Albuterol

13  inhaler for Plaintiff's use when his physical examination in April, 2005 disclosed respiratory

14  "wheezing." A.R. 347.]  Plaintiff reported that he continues to have seizures "every now and then,"

15  and "at least one a month," the seizures having decreased from an earlier frequency of once a week.

16  (A.R. 371.)  Apparently, the last "really major" seizure Plaintiff experienced  was the seizure activity

17  that led to his hospitalization on March 16, 2005.  (Id.)  Plaintiff recalled that he first started having

18  "weekly seizures" on his thirtieth birthday.  (A.R. 372.)  Plaintiff testified that when he has a seizure,

19  he does not remember any of the events surrounding the episode until after it subsides.  (A.R. 371.)

20         Plaintiff fractured his left shoulder during the course of the seizure that occurred at his home

21  in the early morning hours of March 16, 2005.  (A.R. 372.)  That shoulder was surgically repaired[5]

22

---

23  [3]  BuSpar is used in the treatment of anxiety disorders and for short-term relief of the symptoms of anxiety.

24  PDRHealth,  http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=BuS1059.html&contentName=Bu Spar&contentId=94 (last visited August 26, 2009).

25  [4]  Two months before the hearing, Dr. Pineda renewed the medications he prescribed to manage Plaintiff's

26  neurological condition, i.e., BuSpar, ten milligrams, once per day; Depakote extended release tabs, 600 milligrams each, two in the morning and three at bedtime; Dilantin extended release capsules, 100 milligrams each, seven each morning;

27  and Elavil tablets, ten milligrams, once daily.  (A.R. 351.)

28  [5]  Sometime between March 28, 2005 and March 30, 2005, case record information provided by both Plaintiff and his wife indicates that Plaintiff had surgery on his left shoulder to repair the fracture he sustained on March 16, 2005.  (A.R. 140, 151, 153, 239, 279.)  For unknown reasons, there are no medical records of this surgery in the case file from

1   shortly after its injury.  Plaintiff said that he had gotten some rehabilitative physical therapy and had

2   recovered full range of motion in that arm but it remained a source of constant pain and it continued

3   to "pop" and "grind."  (A.R. 372.)  He no longer has the strength in that arm he had before the injury,

4   testifying that he could now lift about twenty to thirty pounds with the arm; he used to be able to lift

5   and carry one hundred pounds.  (A.R. 373.)  In response to his attorney's question regarding how

6   long Plaintiff can now stand without feeling any pain, Plaintiff said that he can stand "without

7   feeling any stress" "for a little while."  (A.R. 375.)  Plaintiff testified that he could sit without feeling

8   pain for a long time, basically "as long as it's not physically draining or mentally strenuous."  (Id.)

9   Apparently, those conditions produce heightened levels of stress in Plaintiff which trigger some kind

10  of deterioration in his mental or physical states.  (Id.)  Plaintiff described what happens now when he

11  experiences these heightened stress levels.  (A.R. 376.)  He explained that he gets "real jittery" and

12  that when he gets "really, really stressed out, [his] lips start quivering and I start having major motor

13  function [sic].  According to my doctor, it's all part of the epilepsy.  I'll have twitches and I'll have

14  ... like smacking of the lips and that's just all signs that I'm getting ready to have a full-blown

15  seizure."  (Id.)

16          Plaintiff testified that he experiences constant stress and apparently believes that his stress

17  contributes to, as well as results from, his epilepsy.  (A.R. 368, 373, 375-376.)  Plaintiff also

18  attributes his epilepsy to a "head injury."[6]  (A.R. 373.)  He sees his treating neurologist, Dr. Gregorio

19  Pineda, every three months.  (A.R. 373.)  At these visits, Dr. Pineda has blood samples taken to

20  measure therapeutic dosages of the prescribed medication in Plaintiff's body and adjusts Plaintiff's

21  medication accordingly.  (A.R. 374.)  Plaintiff said Dr. Pineda explained that the medication will

22  help control the frequency and severity of the episodes but, Plaintiff understood him to say, that the

23  medication would not eliminate the seizures altogether.  (Id.)  Plaintiff said he has his "good days

24

25  the orthopedic provider.  It may be that the surgery was done at Kern Medical Center by a Dr. Gary L. Zohan.  On April
26  4, 2005, Plaintiff had a blood sample taken to measure his Dilantin levels at Kern Medical Center; that test was ordered
    by Dr. Zohan, described in the records as an orthopedist.  (A.R. 279.)

27

28      [6]  In notes recording Plaintiff's March 23, 2005 office visit with Dr. Pineda, Dr. Pineda reports that Plaintiff
    "was discharged from the hospital with a second grand mal seizure.  I am told he has had a severe motor vehicle head
    injury at age nineteen, also had a significant drug use in the past."  (A.R. 282.)

1    and ... bad days, more bad days than good." (Id.)

2          Aside from the functional impacts already described, Plaintiff said that his daily living

3    activities had been circumscribed by his disabilities in other ways.  He said he was "no longer

4    allowed to take showers because if [he] [fell] in the tub again, there's no telling what [he] would do

5    to [him]self." (Id.)  His wife now has to watch him while he bathes because he is afraid of drowning

6    in the tub. (Id.)  He sleeps about three to four hours per night depending on the medication impacts

7    or what the day has brought in terms of stressful incidents. (A.R. 376.)

8          Regarding his past work, Plaintiff testified that he started his working career before the age of

9    eighteen in a McDonald's restaurant. (A.R. 369.)  He worked there until he turned eighteen when he

10   then went to work in construction doing concrete work for the next several years. (Id.)  After that,

11   Plaintiff worked in "offshore drilling" for the next four years. (Id.)  Plaintiff then enrolled in and

12   completed a course in equipment repair, obtaining certificates for air conditioning repair and for farm

13   and heavy equipment repair. (Id., A.R. 379.)  With that vocational training, Plaintiff went to work

14   for Downs Equipment (apparently in 2003 – see A.R. 90, 106) and that is when he "started having

15   [his] problems." (A.R. 369.)  He became "exhausted" after working four hours and have to ask

16   permission to go home early. (A.R. 378.)  Before that, Plaintiff testified that he would never be off

17   work, describing himself as formerly being a "work machine." (Id.)

18         As for Plaintiff's educational background, Plaintiff testified that he had an eighth grade

19   education, having left school after that to work. (A.R. 376.)  He did successfully complete a

20   vocational training course that prepared him to work in the field of repairing heavy equipment. (Id.,

21   A.R. 377.)  Plaintiff's social activities are also limited.  He does almost nothing for relaxation or

22   enjoyment, describing himself as a "homebody" and remarking that "just trying to keep my family

23   where we're at right now" means "[t]here's no way to relax or enjoy anything right now." (A.R.

24   377.)  The family does not go out to eat, preferring to order in. (A.R. 377-378.)  Plaintiff explained

25   that he is "not a good people person and [doesn't] want to offend anybody" nor does he want "to be

26   offended." (A.R. 378.)

27         The ALJ then asked Plaintiff a few questions.  He began with a question about Plaintiff's

28   training in diesel mechanics and any certificates Plaintiff obtained as a result. (A.R. 378-379.)

1  Plaintiff described the certificates he received and his overall performance in the program.  (A.R.

2  379.)  The ALJ also asked when he last saw Dr. Pineda, to which Plaintiff responded that he sees Dr.

3  Pineda on a regular basis.  (Id.) [The medical case records show that Plaintiff last saw Dr. Pineda on

4  August 24, 2006, about two months before the administrative hearing (A.R. 350, 351).]

5        Vocational expert Cheryl Chandler then testified.  (A.R. 379-388.)

6        In the first of the ALJ's hypotheticals posed to her, she was asked to assume an individual of

7  Plaintiff's age, education, and work experience, who could lift and carry ten pounds frequently and

8  twenty pounds occasionally, and who "must avoid exposures to hazards." (A.R. 382.)  The ALJ

9  asked if that person could perform Plaintiff's past relevant work and the VE responded that such a

10  hypothetical worker could not.  (Id.)  The VE testified that such a hypothetical worker could,

11  however, perform other jobs in the regional or national economy, characterizing the hypothetical

12  worker as someone whose abilities and capacities were consistent "with a light RFC with those

13  preclusions for hazards." (A.R. 382-383.)  In California there are roughly 706,000 jobs for worker in

14  the unskilled, light categories "available to someone who has limitations for working in proximity to

15  moving parts, electrical shocks, exposure to high places." (Id.)

16        In the next hypothetical, the ALJ modified his description of the worker to include a

17  limitation that he will miss one day of work a month without any notice.  (A.R. 383.)  VE Chandler

18  responded that it would not change her opinion, "although that's pushing it for most employers, ...

19  even though they're typically allowed ... one full day." (Id.)

20        In his third hypothetical, the ALJ asked the VE to assume the same hypothetical  worker

21  except that instead of missing one full day of work per month without notice, this worker would miss

22  four or five days each month.  (A.R. 383-384.)  The ALJ then asked VE Chandler if that hypothetical

23  worker could perform Plaintiff's past relevant work.  Her response was "neither that nor any other

24  job." (Id.)

25        Finally, and again in response to a question posed by the ALJ, VE Chandler testified that she

26  was not able to evaluate whether it would be more expensive for an employer to insure an employee

27  who is subject to epileptic seizures than an employee who is not.  (A.R. 388.)

28  ///

**LEGAL AND REGULATORY FRAMEWORK**

In order to qualify for benefits, a claimant must establish that s/he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 1382c(a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); Quang v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden of establishing such a disability is initially on the claimant, who must prove that s/he is unable to return to his or her former work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as the claimant's age, education and last fifteen years of work experience.  Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

To be eligible for DIB, a worker must, among other things, be insured for disability purposes and be disabled on that date.  42 U.S.C. § 416(i).  20 C.F.R. § 404.101(a) provides, in part, that a claimant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits; if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations that contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g), 416.920(a)-(g).  These steps are: (1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment; (2) whether solely on the basis of the medical evidence the impairment is severe, that is, of a magnitude sufficient to limit significantly the person's physical or mental ability to do basic work activities; (3) whether solely on the basis of medical evidence the impairment, or combination of impairments, equals or exceeds in severity certain impairments described in Appendix I of the regulations; (4) whether the claimant has sufficient residual functional capacity, defined as what the individual can still do despite limitations, to perform the claimant's past work; and (5) if s/he cannot do so, whether, on the

1   basis of the claimant's age, education, work experience, and residual functional capacity, the

2   claimant can perform any other gainful and substantial work within the national economy.

3        The initial burden of proof rests upon a claimant to establish that s/he "is entitled to the

4   benefits claimed under the Act." Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971)(citations

5   omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that

6   "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that

7   an ALJ's "affirmative duty to assist a claimant to develop the record . . . complicates the allocation

8   of burdens" such that "the ALJ shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094,

9   1098 & n.3 (9th Cir. 1999).  The initial burden is met once a claimant establishes that a physical or

10  mental impairment prevents him from engaging in his previous occupation.  The burden then shifts

11  to the Commissioner to identify other jobs that the claimant is capable of performing considering the

12  claimant's residual functional capacity, as well as the claimant's age, education and last fifteen years

13  of work experience and that a significant number of jobs exist in the national economy which the

14  claimant can perform. Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984); Terry v. Sullivan, 903

15  F.2d at 1275.

16                         **STANDARD AND SCOPE OF REVIEW**

17        Congress has provided a limited scope of judicial review of the Commissioner's decision to

18  deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the

19  Court must determined whether the decision of the Commissioner is supported by substantial

20  evidence. 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," Richardson

21  v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514

22  F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might

23  accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.  The Court must consider

24  the record as a whole, weighing both the evidence that supports and the evidence that detracts from

25  the Commissioner's conclusion; it may not simply isolate a portion of the evidence that supports the

26  decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.

27  2d 993, 995 (9th Cir. 1985).  It is immaterial that the evidence would support a finding contrary to

28  that reached by the Commissioner; the Commissioner's determination as to a factual matter will

1  stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to

2  resolve conflicts in the evidence.  Sorenson v.Weinberger, 514 F.2d at 1119.

3      In weighing the evidence and making findings, the Commissioner must apply the proper legal

4  standards.  Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must review the

5  whole record and uphold the Commissioner's determination that the claimant is not disabled if the

6  Commissioner applied the proper legal standards, and if the Commissioner's findings are supported

7  by substantial evidence.  See Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510

8  (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995.

9  **ALJ'S FINDINGS**

10      At step one, the ALJ found that Plaintiff met the insured status requirements of the Act

11  through the date last insured, December 31, 2008, and that Plaintiff had not engaged in substantial

12  gainful activity since March 1, 2004, the alleged date of onset.  (A.R. 18.)  At step two, the ALJ

13  determined that Plaintiff had severe impairments consisting of a seizure disorder, "status post left

14  shoulder fracture," and "drug abuse."  (Id.)  These impairments were "documented in the reports of

15  Dr. Pineda ... and by x-ray of the left shoulder."  (Id.)  The ALJ stated that he gave no weight to the

16  opinion of the State Agency non-examining, non-treating physician, Dr. Khong, that Plaintiff had no

17  severe physical impairments.  (A.R. 20.)  The ALJ found that the treating records documented these

18  conditions or disorders and it was reasonable to conclude that they would have some effect on

19  Plaintiff's ability to work.  (Id.)

20      At step two, the ALJ also determined that Plaintiff's depression and anxiety were "non-

21  severe" (20 C.F.R. §§ 404.1521,  416.921); they were only slight impairments, having little, if any,

22  effect on Plaintiff's ability to work.  (A.R. 18.)  In reaching this conclusion, the ALJ stated he agreed

23  "with the state agency medical consultants who felt there was insufficient evidence of any medically

24  determinable impairment (Exhibit 10F, p. 1)."  (A.R. 19.)  The ALJ also reasoned that Plaintiff's

25  depression and anxiety were not severe because Plaintiff  "has had no mental health treatment other

26  than the consultative psychological evaluation requested by the state agency ... .  The record shows

27  that [Plaintiff] was prescribed a small dosage of Elavil as a pain management agent and sedative,

28  rather than as an antidepressant... ."  (A.R. 18.)  The ALJ also gave no weight to treating physician

1   Dr. Birds's opinion that Plaintiff's disordered moods (i.e., severe anxiety reactions and chronic

2   depression) were part of the reason Plaintiff had severe difficulty in coping with daily life

3   requirements.  (A.R. 18-19.)  The ALJ discounted Dr. Birds's opinion for two reasons – the opinion

4   appeared to have been entirely based on Plaintiff's subjective reports and Dr. Birds treated Plaintiff

5   on only two occasions.  (A.R. 19.)

6        In concluding that Plaintiff's depression and anxiety were not severe medically determinable

7   mental impairments at step two, the ALJ also said that he gave no weight to several opinions of the

8   state agency's consultative examiner, Dr. Akira Suzuki.  (Id.)  Those opinions of Dr. Suzuki

9   identified as suspect by the ALJ on this issue of mental impairment severity were Dr. Suzuki's

10  conclusions that Plaintiff was prone to repeated episodes of emotional deterioration in work-like

11  settings; was moderately limited in this ability to respond appropriately to co-workers, supervisors,

12  and the public; was moderately compromised in his ability to respond appropriately to usual work

13  situations involving attendance and safety; and was moderately limited in his ability to deal with

14  changes in routine work settings.  (Id.)  The ALJ rejected these opinions because the consultative

15  examiner's "assessment [was] not based on objective findings."  (Id.)  Additionally, the ALJ

16  explained that the results of Plaintiff's mental status examination were essentially normal; that

17  Plaintiff was able to sustain attention and concentration for a reasonable period of time without

18  significant distractibility; and that Plaintiff obtained a score of 79 on the full scale IQ component of

19  the Wechsler Adult Intelligence Scale, 3rd Edition.[7]  (Id.)

20       At step three, the ALJ stated that he had reviewed the impairments listed in Appendix 1,

21  Subpart P, of 20 C.F.R., Part 404 that were most nearly applicable to Plaintiff's medically

22  determinable impairments, particularly Sections 1.02 [major dysfunction of a joint due to any cause],

23  11.02 [convulsive epilepsy], 11.03 [non-convulsive epilepsy], and 12.09 [substance addiction

24  disorders].  (Id.)  After his review, the ALJ concluded that Plaintiff had no impairment or

25  combination of impairments that met or medically equaled any listing.  (Id.)

26       The ALJ then determined that Plaintiff had the residual functional capacity to lift and carry

27

28       [7] This was the full extent of the ALJ's discussion and analysis of Dr. Suzuki's findings and opinions.  (A.R.
     16-22.)

1   twenty pounds occasionally and ten pounds frequently; could stand and walk for a total of six hours

2   in an eight-hour workday; could sit a total of six hours in an eight-hour workday; and must avoid

3   concentrated exposure to hazards.  (Id.)  In reaching this determination, the ALJ considered

4   Plaintiff's subjective complaints and found his statements about the intensity, persistence, and

5   limiting effect of those symptoms "not entirely credible."  (A.R. 20.)  The ALJ acknowledged that

6   Plaintiff's subjective complaints (apparently, pain, fatigue, headaches, irritability, and weakness) but

7   concluded, after "weighing all relevant factors," that those impairments were not as severe as

8   Plaintiff alleged.  (Id.) The ALJ identified the evidence upon which he relied and discussed its

9   significance in Arriving at this credibility determination.  (A.R. 19-20.)

10      At step four, the ALJ found that Plaintiff had past relevant work but could no longer perform

11   that work.  (A.R. 21.)  However, at step five, the ALJ determined that, given Plaintiff's age,

12   education, work experience, and residual functional capacity, a significant number of jobs existed in

13   the national economy that Plaintiff could still perform.  (Id.) The ALJ specifically noted that the

14   VE's testimony was consistent with information in the Dictionary of Occupational Titles, as required

15   under Social Security Ruling ("SSR") 00-4p.  Accordingly, the ALJ concluded that Plaintiff

16   was not disabled under the framework of Medical-Vocational Rule 202.18. (A.R. 22.)

17                                    **ISSUES**

18      Plaintiff's Opening Brief raises the following issues for consideration:

19      1.      The ALJ failed to evaluate properly the opinions of consultative examiner Dr. Akira

20   Suzuki insofar as the ALJ did not articulate specific and legitimate reasons, based on substantial

21   evidence, for rejecting those opinions.  Embedded in this contention are two additional asserted

22   errors – the failure to consider the opinion of a state agency physician who concluded that Plaintiff

23   did have a medically determinable mental impairment and the failure to develop the record more

24   fully to the extent that the medical evidence concerning the existence and severity of Plaintiff's

25   alleged mental impairment was ambiguous or inadequate to allow for proper evaluation of such

26   evidence;

27      2.      The ALJ did not articulate specific and legitimate reasons for rejecting the opinions of

28   Dr. Birds, Plaintiff's treating physician, and did not accord them proper weight under the law; and

1        3.       A remand under sentence six of 42 U.S.C. § 405(g) is warranted because new and

2   material evidence has become available since the Appeals Council denied Plaintiff's request for

3   review.  This new and material evidence creates a reasonable possibility that the ALJ's assessment of

4   the credibility of Plaintiff's subjective complaints may change, resulting in a reversal or significant

5   modification of the ALJ's adverse credibility findings.  Either of those outcomes, Plaintiff contends,

6   could substantially alter the assessment of Plaintiff's functional limitations in a manner favorable to

7   Plaintiff's disability claim.

8        As discussed <u>supra</u>, this Court must uphold the Commissioner's determination that a

9   claimant is not disabled unless it contains legal error or is not supported by substantial evidence in

10  the record as a whole.  <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007).

11                              **DISCUSSION**

12  A.       PROPRIETY OF TREATMENT OF MEDICAL OPINION EVIDENCE.

13       1.       <u>Dr. Akira Suzuki's Opinions</u>.

14       According to the Commissioner's documentation, Plaintiff  applied for benefits claiming an

15  inability to work due to a seizure disorder, a learning disorder, depression, and anxiety.  (A.R. 41.)

16  The alleged learning disorder, depression, and anxiety are all appropriately classified as potential

17  mental disorders.  (<u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02, 12.04, 12.06.)

18       The ALJ's decision addressed the existence and severity of two of these three claimed

19  disorders, i.e., anxiety and depression, at step two of the sequential evaluation process.  At step two,

20  the ALJ determined that there was not sufficient evidence to establish that Plaintiff's anxiety and

21  depression were medically determinable mental impairments.  He also concluded that Plaintiff's

22  anxiety and depression were "non-severe" conditions, that is, they were only slight impairments

23  having little, if any, effect on Plaintiff's ability to perform basic work activities.   The ALJ's decision

24  is silent on the issue of the existence or severity of Plaintiff's learning disorder.

25       The basis for the conclusion that the evidence was insufficient to establish the requisite

26  medically determinable impairment was an opinion rendered by one of the state agency's non-

27  treating, non-examining medical consultants, Dr. Archimedes Garcia.  (A.R. 19, 291.)  The ALJ gave

28  no rationale for relying upon that opinion to the exclusion of other conflicting opinions in this

13

1    record.  Moreover, the ALJ did not discuss the basis for the physician's conclusion that there was

2    insufficient evidence in the medical record to support the establishment of anxiety and/or depression

3    as medically determinable mental impairment(s).  All the ALJ said was that he agreed with the

4    doctor's opinion.

5          The bases for the alternative ruling of "non-severe" were several.  First, Plaintiff  had no

6    mental treatment for his anxiety and depression; the Elavil he took daily but not as an

7    antidepressant.  Second, the ALJ rejected the opinion of Plaintiff's treating physician, Dr. Birds, that

8    Plaintiff would have severe difficulty in coping with daily life requirements and was unable to hold

9    productive employment because of his symptoms.  The ALJ's decision accorded no weight to that

10   opinion because it appeared to have been based entirely on Plaintiff's subjective reports and was

11   formulated after having seen Plaintiff on two occasions.  Third, the ALJ gave no weight to Dr.

12   Suzuki's opinions that Plaintiff was prone to repeated episodes of emotional deterioration in work-

13   like situations; was moderately limited in his ability to respond to co-workers, supervisors, and the

14   public; was [moderately compromised in his ability] to respond appropriately to usual work

15   situations involving attendance and safety; and was [moderately limited in his ability to] deal with

16   changes in routine work settings.  The ALJ completely discounted these opinions of Dr. Suzuki

17   because "Dr. Suzuki's assessment is not based on objective findings."  The ALJ apparently

18   explained this conclusion by noting that Plaintiff's "mental status examination was essentially

19   normal, Plaintiff was able to sustain attention and concentration for a reasonable period of time

20   without distractibility, and his full scale IQ score on the Wechsler Adult Intelligence Scale, 3rd

21   Edition, was 79.

22         Plaintiff contends that the ALJ's treatment of Dr. Suzuki's opinion was reversible error.

23   According to Plaintiff, the ALJ's decision regarding the existence and severity of Plaintiff's alleged

24   medically determinable mental impairments was incorrect because it failed to evaluate Dr. Suzuki's

25   opinion properly.  In its flawed treatment of Dr. Suzuki's opinions, it wandered into areas of

26   reasoning and reliance that were not supported by substantial evidence.  Moreover, a satisfactory

27   analysis of the evidence before the ALJ disclosed fairly obvious ambiguities or gaps in necessary

28   information, a circumstance that triggered the ALJ's duty to develop the medical record more fully,

1   an obligation that was not met.  Consequently, Plaintiff argues, the conclusions reached at step two

2   and the residual functional capacity assessment were incorrect.

3         In order to assist in the adjudication of Plaintiff's disability claims under the Act, the

4   California Department of Social Services Disability Determination Service Division ("the State

5   Agency") asked Dr. Akira Suzuki, a well credentialed, licensed clinical psychologist (see A.R. 246),

6   to conduct a comprehensive mental status examination of Plaintiff.  The Court assumes it did so in

7   order to assist the Commissioner in determining  whether there was evidence that Plaintiff suffered

8   from one or more of the mental impairments he claimed; if so, whether such mental impairment(s)

9   were severe for purposes of steps two and three; and if not severe, whether any functional limitations

10  resulting from those conditions were legitimate concerns for purposes of determining Plaintiff's

11  residual functional capacity.  Obtaining such a consultative examination for these purposes would be

12  consistent with the instructions contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, Section

13  12.00A.-D. and 20 C.F.R. §§ 404.1520a, 416.920a.

14        Dr. Suzuki's examination took place on April 25, 2005.  As part of that examination, Dr.

15  Suzuki reviewed the minimal medical records provided by the State Agency, conducted a lengthy

16  face-to-face interview with Plaintiff and his wife, and administered several psychometric tests (i.e.,

17  the Wechsler Adult Intelligence Scale, 3rd edition, the Wechsler Memory Scale, 3rd edition, and the

18  Bender-Gestalt Test, 2nd edition).  The components of Dr. Suzuki's evaluation included appearance,

19  degree of alertness, speech, behavior, environmental orientation or awareness, mood, affect, thought

20  processes and content, memory, ability to perform calculations, judgment, and cognitive ability

21  involving cortical functioning and reasoning.  Additionally, the interview process addressed areas

22  involving Plaintiff's current adaptive functioning and daily activities; historical information

23  pertaining to his family of origin and his life within that family unit; his marital and interpersonal

24  history; his medical, educational, occupational/vocational histories; his financial and adaptive

25  functioning in the past; military service; problems with the law; family history of illness; and his

26  own psychiatric and substance abuse experiences.

27        Dr. Suzuki's objective findings included the following.  Plaintiff "presents with a history of

28  seizures, severe substance dependence, and special education placement.  He currently presents with

focalized cognitive deficits, particularly a mild impairment in his upper cortical functioning.  In the

visuomotor and visuospatial functioning, he does not present with gross signs of organic brain

dysfunction, however."  Apparently using the reference tool of the *Diagnostic and Statistical Manual*

*of Mental Disorders*, Dr. Suzuki diagnosed Plaintiff as having the following mental conditions or

disorders:

| | |
|---|---|
| Axis I: | 294.9 Cognitive disorder, NOS |
| | 315.9 Learning disorder, NOS |
| | 304.40 Amphetamine Dependence, Sustained Full Remission |
| Axis II: | V71.09 No diagnosis on Axis II |
| Axis III: | Seizure Disorder, left shoulder injury due to fall in March of 2005 |
| Axis IV: | Educational and occupational problems |
| Axis V: | GAF = 58 (current) |

(A.R. 245.)   Dr. Suzuki offered the following opinions:

> Based upon the above findings, ... claimant ... presents with a moderate restriction of daily activities due to his poorly controlled seizure activities, resulting in an injury.  Also, his focal cognitive impairment restricts his ability to engage himself in a task requiring a high level of problem-solving.  In view of his social avoidance, he presents with a mild difficulty in maintaining social functioning.  He also presents with a mild difficulty of concentration, yet, with no apparent difficulty in persistence.  His pace is relatively intact.  Due to his "rage" reaction, he is prone to repeated episodes of emotional deterioration in work-like situations, as he is poorly able to modulate environmental stressors. He is able to understand, carry out, and remember simple instructions.  He is moderately limited in his ability to respond appropriately to co-workers, supervisors, and the public as a result of his poorly controlled seizures.  For the same reason, he is moderately compromised in his ability to respond appropriately to usual work situations involving attendance and safety.  As a result of his cognitive impairment, he is moderately limited in his ability to deal with the changes in the routine work setting. ...

(A.R. 245-246.)

    In challenging the propriety of the ALJ's treatment of Dr. Suzuki and its resulting impact on

the validity of the decision-maker's step two finding, Plaintiff correctly recognizes that the ALJ was

not bound by Dr. Suzuki's opinions but, in order to reject or discount those opinions, the law

requires that the ALJ articulate specific and legitimate reasons, based on substantial evidence in the

record.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).  This can be done by setting out a

detailed and thorough summary of the facts and the conflicting evidence, stating his interpretation

1   thereof, and making findings.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Such an

2   exposition and analysis is missing here.

3          Dr. Suzuki noted several medically determinable mental impairments (none being the two

4   conditions the ALJ actually discussed in his decision, depression and anxiety).  One of the

5   assessments reached by Dr. Suzuki included a finding  that Plaintiff was moderately limited in his

6   ability to deal with changes in routine work settings as a result of his cognitive impairment.  This

7   appears to be an area of functioning related to both daily living activities and social functioning.  20

8   C.F.R. §§ 404.1520a(d) and 416.920a(d) suggest that this level of interference would be

9   characterized as something more than "slight."  The ALJ's decision appears to ignore the existence

10  or impacts of Plaintiff's learning and cognitive disorders.

11         Dr. Suzuki advised that, because Plaintiff is poorly able to modulate environmental stressors

12  because of his "rage" reactions, Plaintiff is prone to repeated episodes of emotional deterioration in

13  work-like settings.  Plaintiff's poorly controlled seizures moderately limit Plaintiff's ability to

14  respond appropriately to co-workers, supervisors, and the public as well as his ability to respond

15  appropriately to usual work situations involving attendance and safety.  The ALJ dismisses these

16  opinions by stating they were not based on objective findings.  The ALJ is simply incorrect in this

17  conclusion.  Dr. Suzuki's comprehensive mental status examination resulted in competent

18  conclusions regarding the presence of those mental disorders or conditions in Plaintiff.  Clearly they

19  were, according to the definition of the terms, "objective medical evidence," "signs," and "laboratory

20  findings" used in the regulations.  (See 20 C.F.R. §§ 404.1512, 404.1528, 416.912, 416.928.)

21  Moreover, Dr. Suzuki's examination closely conformed to the recommended approach to

22  "Assessment of Severity" and  "Documentation" set out in 20 C.F.R. Part 404, Subpart P, Appendix

23  1, Section 12.00C. and D.4.-6.

24         By his use of the term, "not based on objective findings," it may be the ALJ intended to

25  communicate that he interpreted the results of Plaintiff's  mental status exam differently than did Dr.

26  Suzuki.  Certainly, the ALJ immediately followed this statement by pointing out that Plaintiff's

27  mental status examination was essentially normal; that Plaintiff was able to sustain attention and

28  concentration for a reasonable period of time without significant distractibility; and that Plaintiff

1   obtained a score of 79 on the full scale measurement of IQ on the Wechsler Adult Intelligence Scale.

2   In doing so, the ALJ did not point to any opinions reached by other clinicians with the necessary

3   expertise that might support the ALJ's conclusions about the nature of Dr. Suzuki's findings.  The

4   ALJ simply proceeded to, essentially, reinterpret the results of the mental status exam and the

5   psychometric testing and to render a clinical judgment as to what isolated components of an overall

6   clinical picture of mental status might mean.  This was error.  The ALJ has not been shown to have

7   the  expertise necessary to reach such conclusions nor is such an undertaking within the proper

8   purview of the ALJ.  (See Day v. Weinberger, 522 F. 2d 1154, 1156 (9th Cir. 1975); Winters v.

9   Barnhart, 2003 U.S. Distr. LEXIS 18544 at *6 (N.D. Cal. Oct. 15, 2003); Oseguera v. Astrue, 2009

10  U.S.Dist. LEXIS 16868 at *21 (C.D. Cal. March 5, 2009); 20 C.F.R. §§ 404.1513(a) and

11  416.913(a).)

12          In his Responsive Brief, the Commissioner argues that Dr. Suzuki was not competent to

13  make the objective findings and render the opinions he offered.  Given that Dr. Suzuki was selected

14  by the Commissioner to perform the examination and testing, an examination apparently conducted

15  in order to reach an opinion on the existence and severity of Plaintiff's alleged mental impairments,

16  the Commissioner's argument is, at best, weak.  Moreover, 20 C.F.R. §§ 404.1513(a)(2) and

17  416.913(a)(2) indicate that Dr. Suzuki has the necessary qualifications to conduct the mental status

18  examination and psychometric testing performed and the expertise needed to arrive at reliable and

19  accurate opinions based on those results.  As for characterizing Dr. Suzuki's opinions as to

20  Plaintiff's functional limitations as a willingness to speculate, competent expert opinion relating to

21  the progression and likely future impacts of a disease process is not "speculation."  There is a

22  trained, knowledgeable, and informed factual basis for assessments of the likelihood that persons

23  with certain behavioral characteristics will act in specific ways.  Suggesting that Dr. Suzuki did not

24  have the expertise to evaluate the potential interrelationship and/or correlation between a person's

25  current general medical conditions and his or her medical mental or behavioral disorders would

26  eliminate the need for, and utility of, the Axis III assessment in the DSM's multiaxial assessment.

27  "Axis III is for reporting current general medial conditions that are potentially relevant to the

28  understanding or management of the individual's mental disorder.  The multiaxial distinction among

1  Axis I, Axis II, and Axis III disorders does not imply that mental disorders are unrelated to physical

2  or biological factors or processes or that general medical conditions are unrelated to behavioral or

3  psychosocial factors or processes.  General medical conditions can be related to mental disorders in a

4  variety of ways.  In some cases it is clear that the general medical condition is directly etiological to

5  the development or worsening of mental symptoms and that the mechanism for this effect is

6  physiological."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental*

7  *Disorders*, Fourth Edition, Text Revision, 29, (2000).  Finally, even if there were any merit to the

8  Commissioner's argument, which there is not, it is doomed because it was not a basis articulated by

9  the ALJ for rejecting Dr. Suzuki's opinion.  The Court can evaluate an agency's decision only on

10 grounds articulated by the agency.  Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738

11 (9th Cir.1991) .

12     The ALJ's treatment of Dr. Suzuki is extremely limited in its scope and ignored critical

13 aspects of Dr. Suzuki's assessment.  The ALJ's rationale for rejecting Dr. Suzuki's opinion is both

14 cursory and incorrect.  And it is not saved by the ALJ's passing reference to the opinion of Dr.

15 Garcia in the last sentence of the step two analysis.

16     The ALJ closed out his discussion and analysis of the evidence supporting his findings at step

17 two of the sequential evaluation by referencing the opinion of one other State Agency clinician, Dr.

18 Archimedes Garcia, a non-examining psychiatrist.  Specifically, the ALJ stated in his decision that

19 "he agrees with the state-agency medical consultants[8] who felt there was insufficient evidence to

20 establish any medically-determinable [sic] impairment (Exhibit 10F, p. 1)."  Dr. Garcia's opinion

21 was dated October 3, 2005 and consisted of a single page of the Psychiatric Review Technique form.

22 (A.R. 291.)  In the Medical Disposition portion of the Medical Summary section (i.e., "I.B."), Dr.

23 Garcia placed a check mark in the "insufficient evidence" box.  He left blank all the boxes under I.C.

24 that describe a series of categories of mental disorders upon which the medical disposition is based.

25 Finally, at the bottom of the page, immediately above his signature, Dr. Garcia checked the box that

26 states, "These finding complete the medical portion of the disability determination."  (A.R. 291.)

27

28     [8]  Use of the plural appears inadvertent here.  The reference to Exhibit 10F, p. 1 describes a record generated
only by Dr. Garcia.

1   This single page document is marked in the administrative transcript as "Exhibit 10F Pg. 1 of 4." <u>Id.</u>

2          The opinion of Dr. Garcia, a non-treating, non-examining physician, does not appear to

3   constitute substantial evidence under these facts.  While the opinion of a non-treating, non-

4   examining physician can amount to substantial evidence, it must be supported by other evidence in

5   the record, such as the opinions of other examining and consulting physicians, which are in turn

6   based on independent clinical findings.  <u>Andrews v. Shalala</u>, 53 F.3d at 1041.  Independent clinical

7   findings can be either (1) diagnoses that differ from those offered by another physician and that are

8   supported by substantial evidence, or (2) findings based on objective medical tests that the other

9   physician has not himself or herself considered.  <u>See</u> <u>Orn v. Astrue</u>, 495 F.3d at 632; <u>Murray v.</u>

10  <u>Heckler</u>, 722 F.2d 499, 501-502 (9th Cir. 1983).

11         The Court can find nothing here that would fit within these legal parameters.  Dr. Garcia did

12  not examine Plaintiff, he conducted no objective tests, he arrived at no differential diagnosis.  He

13  explains nothing about his conclusion – what evidence he relied on, what evidence he dismissed or

14  discounted, what reasoning he applied to the facts he found significant.  That omission alone makes

15  it impossible to square the ALJ's ruling  with the requirements imposed by <u>Magallenes v. Bowen</u>.

16  But the ALJ's heavy reliance on Dr. Garcia's opinion becomes even more problematic when the rest

17  of the medical case record is considered.  Drs. Birds, Biala, and Suzuki were all of the opinion that

18  Plaintiff had medically determinable mental impairments.  Dr. Pineda, Plaintiff's treating

19  neurologist, prescribed BuSpar to Plaintiff to help better control Plaintiff's seizure disorder through a

20  reduction of Plaintiff's anxiety levels.  Admittedly, Dr. Khong completed a Physical Residual

21  Functional Capacity Assessment in September, 2005 regarding Plaintiff's functional abilities and in

22  the process of rendering that assessment, appears to have suggested that aspects of Plaintiff's mental

23  status claims were open to some question:

24

25          Mentally, [the medical source opinion] offered by Dr. Bird [sic] at
            the Budget clinic appears to be entirely due to claimant's
26          subj[ective] reports to him [sic] as that [treating source] had only
            seen [claimant] twice at the time the letter was written. [Claimant]
27          was referred to Kern County MH [mental health] but a request for
            records from them shows that the [claimant] never [followed up] or
28          sought [treatment] there.  There is essentially no longitudinal
            history of a psych d/o.  Credibility at issue.  Defer to psych MC.

A.R.

However, Dr. Khong's statement does not provide the requisite evidentiary support to shore up Dr. Garcia's conclusion about the sufficiency of the evidence to establish a medically determinable mental impairment.  Dr. Khong's assessment appears to rely heavily on Plaintiff's failure to pursue mental health treatment when recommended to do so and the lack of a longitudinal "psych" history.  Dr. Khong is factually incorrect in her conclusion that Plaintiff was referred to Kern County Mental Health for treatment and that he failed to follow up there.  The records request to which Dr. Khong refers in her statement asked for outpatient treatment information from March 2004 to August 2005; Plaintiff was referred to Kern County Mental Health for counseling treatment when he was fourteen years old and there is evidence that he did attend some form of treatment there for some period of time.  (A.R. 117.)  As for the lack of a longitudinal history of a psychological disorder, Dr. Khong overlooks, or is unaware of, the treatment records of Dr. Birds that report Plaintiff had been taking Xanax, presumably for his anxiety, for the two years prior to his initial appointment with her (A.R. 235), as well as the statements of both Plaintiff and his wife describing his struggles with appropriate behavior management and social interaction that appear to have plagued Plaintiff for a long period of time, to say nothing of his early history of child abuse and exposure to other forms of domestic violence (A.R. 240, 300, 301) as well as his long-term methamphetamine dependence.  Surely, these are indicia of a longitudinal "psych" history.

Reliance upon the ALJ's finding that Plaintiff had *no* mental treatment for his anxiety and depression (see A.R. 18) as a basis for discounting Dr. Suzuki's opinion would also be misplaced for two reasons.  First, the ALJ did not say so.  Second, Dr. Suzuki's opinion dealt with mental impairments other than anxiety and depression.  Third, the ALJ's information is not correct.  As noted, Dr. Birds's treatment records show that Plaintiff had been prescribed antidepressant medication (Zoloft and Cymbalta) for his depression and Xanax for his anxiety (A.R. 232) and that Plaintiff had been taking Xanax for two years as January of 2005 (A.R. 235).  Moreover, Plaintiff had been taking BuSpar to help manage his anxiety levels; the ALJ's conclusion takes no account of this fact.  Contrary to the ALJ's finding, there *is* evidence in this case record that Plaintiff had received medical assistance to help manage his mental health disorders.

In view of the foregoing, the ALJ's treatment of Dr. Suzuki's is too spare and too conclusory

21

1   to satisfy the mandates imposed by <u>Andrews v. Shalala</u> and <u>Magallenes v. Bowen</u>.  Therefore, the

2   Court cannot conclude the ALJ's treatment of Dr. Suzuki's opinion was free of legal error and

3   supported by substantial evidence.

4          Even were this Court to have found otherwise, the Court would still be compelled to

5   conclude that the issue had been incorrectly handled by the ALJ.  In a social security case, an ALJ is

6   obligated to fully and fairly develop the record, even if the claimant is represented by counsel, when

7   there is ambiguous  evidence or when the record is inadequate to allow for the proper evaluation of

8   the evidence.  <u>Celaya v. Halter</u>, 332 F.3d 1177, 1183 (9th Cir. 2003); <u>Tonapetyan v. Halter</u>, 242 F.3d

9   1144, 1150 (9th Cir.2001); <u>Mayes v. Massanari</u>, 276 453, 459-460 (9th Cir. 2001).  Here, the *best*

10   that can be said about the state of the evidence on the issue of the existence and severity of medically

11   determinable mental impairment(s) was that it was ambiguous or incomplete.  Even Dr. Garcia did

12   not conclude that Plaintiff had no medically severe mental impairment or that the impairment was

13   not severe, although these were options available to him on the form he used to record his opinion.

14   Instead, Dr. Garcia said there was simply not enough evidence to know.  Even if Dr. Garcia's

15   opinion could be fully credited,[9] the result – with which the ALJ agreed – is that the record was not

16   adequate to resolve this issue.  Consequently, the ALJ should have taken further steps to resolve the

17   ambiguities or gaps in information.  His failure to do so was error.

18          2.      <u>Dr. Valentine Birds's Opinion.</u>

19          Plaintiff also urges the Court to recognize that the ALJ erred in failing to articulate specific

20   and legitimate reasons for rejecting the opinion of Dr. Birds, Plaintiff's treating physician, and in

21   failing to accord them proper weight under the law.  The particular opinion Plaintiff appears to

22   challenge is the doctor's assessment that Plaintiff has been unable to hold productive employment

23   due to symptoms related  to his physical and mental health conditions.

24          Dr. Birds and Plaintiff entered into a physician-patient relationship on January 3, 2005.  Dr.

25   Birds saw Plaintiff on three occasions between that date and March 9, 2005.  Among other things,

26   Dr. Birds diagnosed Plaintiff with chronic depression, severe anxiety reactions, and epileptic

27

28          _____

        [9]  A "check-the-box" assessment that contains little, if any, explanation for the identified limitations bears little
   weight.  <u>Crane v. Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996).

                                                        22

1   episodes.  She prescribed anti-anxiety and antidepressant medication for Plaintiff's mental health

2   conditions and recommended that he be seen by a specialist for an MRI or CT scan as well as a

3   neurological consult.  (A.R. 233.)  In a letter dated April 4, 2005, Dr. Birds stated that Plaintiff "has

4   severe difficulty in coping with daily life requirements.  He has proven unable to hold productive

5   employment due to all symptoms."  (A.R. 232.)  The ALJ gave no weight to this opinion because it

6   appears to have been based entirely on Plaintiff's subjective reports and because it was rendered after

7   having seen Plaintiff only two occasions.

8          Much space is given in these briefs as to whether or not Dr. Birds was a treating physician.

9   The Commissioner maintains she was not because the two or three visits encompassed within the

10  entirety of their relationship was not of sufficient longevity to be fairly described as the kind of

11  treatment relationship contemplated by the regulations.  Plaintiff, on the other hand, insists that it

12  was, citing <u>Ghokassian v. Shalala</u>, 41 F.3d 1300, 1303 (9th Cir. 1994) for the proposition that even

13  two visits would be sufficient.  Plaintiff also points out that Dr. Birds formulated a treatment plan for

14  Plaintiff and prescribed several medications for treatment of various conditions.

15         Although the Court is inclined to agree with Plaintiff's characterization of the relationship as

16  that of a treating relationship, clearly it was an incipient one,  with relatively few examinations,

17  limited medical interventions, and virtually no use of laboratory diagnostic techniques.  As a general

18  rule, a treating physician's opinion is given special weight (SSR 96-2p) because of his or her

19  familiarity with the claimant's physical condition.  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).

20  However, as is the case here, a medical source opinion that an individual is "unable to work" is an

21  opinion on an issue reserved to the Commissioner.  While the opinion must still be considered in

22  adjudicating a disability claim, it is entitled to no special significance because of its source.  SSR 96-

23  8p(e)(1) & n.8.

24         The Court finds no error in the ALJ's treatment of Dr. Birds's opinion that Plaintiff "has

25  severe difficulty in coping with daily life requirements ...[and] ... has proven unable to hold

26  productive employment due to all symptoms."  (A.R. 232.)  A careful review of the medical records

27  provided by Dr. Birds pertaining to Plaintiff's treatment discloses no information that would

28  contradict the ALJ's assessment that Dr. Birds's conclusion as to the impacts of Plaintiff's claimed

1   disabilities was based entirely on Plaintiff's self-reports.  While there is corroborating medical

2   evidence of an epileptic seizure in Plaintiff's medical file, Dr. Birds did not observe that event,

3   participate in Plaintiff's treatment for that episode, or provide any aftercare.  Nor did she follow up

4   with Plaintiff or other providers as to any continuing residual functional impacts of that episode.

5   Given this state of the evidence, the ALJ could reasonably infer that Dr. Birds's assessment of

6   Plaintiff's disability status was the result of information provided solely by Plaintiff.  (See Sample v.

7   Schweiker, 694 F.2d 639, 642 (9th Cir. 1982) – an ALJ is entitled to draw inferences logically

8   flowing from the evidence).  The value of that information was seriously eroded by the fact that the

9   ALJ found Plaintiff's subjective complaints to lack credibility – a result Plaintiff does not challenge

10  here.  Further, it is established that where an expert's opinion is based largely on the Plaintiff's own

11  subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to

12  those subjective symptoms, the ALJ may reject the opinion.  Matney on Behalf of Matney v.

13  Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992); Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

14          Additionally, the ALJ discounted the weight of Dr. Birds's opinion on this issue reserved to

15  the Commissioner in part because it was based on very limited contact with Plaintiff.  She had seen

16  Plaintiff in her clinic three times for examination, limited observation, some early treatment

17  planning, medication prescription and status monitoring.  While certainly not de minimus care, it

18  does suggest that Dr. Birds's opinion as to the longer-term disability status of Plaintiff might have

19  been premature.  The Court understands the ALJ's reference to the relatively few visits Plaintiff had

20  with Dr. Birds to capture, in a kind of telegraphic fashion, these considerations.

21  B.      PROPRIETY OF SENTENCE SIX REMAND BASED ON NEW AND MATERIAL
            EVIDENCE.

22
23          Plaintiff also seeks a remand under sentence six of 42 U.S.C. § 405(g).  His request is based

    on new and material evidence that has become available since the Appeals Council denied Plaintiff's

24  request for review.  This new and material evidence is the report of an abnormal twenty-four hour

25  EEG done by Dr. Pineda's office on April 8, 2008 indicating the presence of numerous partial onset

26  seizures.  Plaintiff maintains that this new evidence of seizures  warrants remand because it creates a

27  reasonable possibility that the ALJ's assessment of the credibility of Plaintiff's subjective complaints

28  may change, resulting in a reversal or significant modification of the ALJ's adverse credibility

1  findings.  A reversal or significant change in the credibility findings could substantially alter the

2  assessment of Plaintiff's functional limitations in a manner favorable to Plaintiff's disability claim,

3  according to Plaintiff's argument. The Commissioner responds that the newly offered evidence

4  would not have changed the ALJ's decision because the new evidence "merely established that

5  [Plaintiff] had abnormal electrodiagnostic studies after the relevant period," i.e., March 1, 2004

6  (alleged date of onset) through November 22, 2006 (the date of the ALJ's decision).

7     Because this matter will be remanded for further hearing as the result of the error in

8  evaluating the opinion of Dr. Suzuki, it appears unnecessary to reach this issue at this time. At the

9  hearing following remand, this new evidence may be introduced and considered where relevant to

10  those issues under consideration.

11  C.     REMAND

12     Section 405(g) of Title 42 of the United States Code provides that "the court shall have the

13  power to enter, based upon the pleadings and transcript of the record, a judgment affirming,

14  modifying, or reversing the decision of the Secretary, with or without remanding the cause for a

15  rehearing."  In social security cases, the decision to remand to the Commissioner for further

16  proceedings or simply award benefits is within the discretion of the court.  McAllister v. Sullivan,

17  888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

18  administrative proceeding, a social security case should be remanded.  Where, however, a rehearing

19  would simply delay receipt of benefits, reversal and an award of benefits is proper."  Id. (citation

20  omitted); see also Varney v. Secretary of Health & Human Services, 859 F.2d 1396, 1399 (9th Cir.

21  1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served

22  by further administrative proceedings, or where the record has been thoroughly developed.").

23     Here, the Court finds that remand for further proceedings is proper.  The ALJ should be

24  allowed the opportunity to further develop the record with regard to the existence and severity of

25  Plaintiff's mental impairments, specifically, his learning and cognitive disorders; to appropriately

26  evaluate the medical source opinion evidence of Dr. Suzuki; to reconsider the assessment of

27  Plaintiff's residual functional capacity in light of the conclusions reached after re-evaluating Dr.

28  Suzuki's opinion and obtaining any other evidence in the course of further developing  the record; as

1  a result of this further consideration of evidence relating to specific mental impairments, to

2  reconsider the combination of both severe and non-severe impairments as they might affect

3  Plaintiff's residual functional capacities; to reconsider the credibility of Plaintiff's subjective

4  complaints to the extent that the issue is impacted by the introduction of new evidence or the

5  modification of any conclusions based upon a reconsideration of the medical opinion evidence; and,

6  to the extent appropriate, for further consideration of whether, on the basis of Plaintiff's age,

7  education, work experience, and residual functional capacity, Plaintiff could perform any other

8  gainful and substantial work that exists in the national economy.

9  <u>**CONCLUSION**</u>

10      Based on the foregoing, the Court finds that the ALJ's decision was not supported by

11  substantial evidence in the record and was not based on proper legal standards.  Therefore, the

12      Accordingly, IT IS ORDERED that

13  1.      Plaintiff's social security complaint BE GRANTED;

14  2.      The matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further

15  proceedings, consistent with this decision; and

16  3.      Judgment BE ENTERED for Plaintiff Jason Dewayne Ennis and against Defendant

17  Michael J. Astrue, Commissioner of Social Security.

18

19      IT IS SO ORDERED.

20  **Dated:  __September 22, 2009__**               __/s/ **Dennis L. Beck**__
                                                    UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28